# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**AJIT BHOGAITA,**

      **Plaintiff,**

**v.**                                                       **Case No: 6:11-cv-1637-Orl-31DAB**

**ALTAMONTE HEIGHTS**
**CONDOMINIUM ASSN., INC.,**

      **Defendant.**

## ORDER

This cause comes before the Court without oral argument on cross-motions for summary judgment, filed by Plaintiff, Ajit Bhogaita (Doc. 36) and Defendant Altamonte Heights Condominium Association, Inc. ("AHCA") (Doc. 34). [1] As discussed below, Plaintiff's Motion will be granted in part, while Defendant's motion will be denied.

### I. Background

Unless otherwise indicated, the following facts appear to be undisputed. Defendant, AHCA is a condominium association in Altamonte Springs, Florida. Bhogaita is a veteran of the United States Air Force who suffers from Post-Traumatic Stress Disorder resulting in "chronic anxiety" and depression. (Doc. 1, ¶ 5). He purchased a condominium unit in Altamonte Heights in May of

---

[1] The Court has considered several other documents, two responses (Docs. 45 and 46), two replies (Docs. 50 and 52), and two supplemental briefs filed at the direction of the Court (Docs. 61 and 62).

2001. (Doc. 35-3 at 144). At all relevant times the association rules and regulations for Altamonte Heights limited all pets to no larger than twenty-five pounds. (Doc. 35-5 at 5).[2]

In July, 2008, Bhogaita acquired his dog, Kane, from a co-worker who could no longer care for him—Kane weighed more than twenty-five pounds. On May 4, 2010, AHCA sent a notice to Bhogaita which demanded he remove Kane because he exceeded the twenty-five pound weight limit. (Doc. 36-5). Bhogaita responded on May 7, 2010, by sending a note from his "treating medical professional, 'Dr. Li,' " which stated, *inter alia*,

> [d]ue to mental illness, [Bhogaita] has certain limitations regarding social interaction and coping with stress and anxiety. In order to help alleviate these difficulties, and to enhance his ability to live independently and to fully use and enjoy the dwelling unit, I am prescribing an emotional support animal that will assist [Bhogaita] in coping with his disability.

(Doc. 1, ¶ 8). Bhogaita hand delivered this note to the AHCA board during a meeting but was subsequently informed that the note needed to name the dog specifically. A few days later, Dr. Li authored another note which added, "I am prescribing an emotional support animal that will assist [Bhogaita] in coping with his disability, specifically his dog, Kane. [Bhogaita] has therapeutic relationship with this specific dog, Kane. As an emotional support animal, Kane serves to ameliorate otherwise difficult to manage day to day psychiatric symptoms in [Bhogaita]." (Doc. 1, ¶ 9).

On July 13, 2010, AHCA requested the following additional information in response,

1. What is the exact nature of your impairment? How does it substantially limit a major life activity?

2. How long have you been receiving treatment for this specific impairment?

3. How many sessions have you had with Dr. Li?

---

[2] Plaintiff indicated in deposition that he was not aware of this rule until 2010 when he was asked to remove his dog. At that time, he thought the rule might not apply to him. There does not appear to be a genuine dispute, however, about whether this rule was applicable to Plaintiff.

- 2 -

    4. What specific training has your dog received?

    5. Why does it require a dog over 25 pounds to afford you an equal opportunity to use and enjoy your dwelling?

(Doc. 35-5 at 15). On July 27, 2010 Bhogaita responded by providing a third letter from Dr. Li which stated,

> Mr. Ajit Bhogaita is my patient and is currently under my care. His [sic] is being treatment [sic] for anxiety related to military trauma.
> Due to mental illness, Mr. Bhogaita has certain limitations regarding social interaction and coping with stress and anxiety. This limits his ability to work directly with other people, a major life activity. Currently he has been hired to perform technical support work from home. He is able to work with the assistance of his emotional support animal. Otherwise his social interactions would be so overwhelming that he would be unable to perform work of any kind.
> I am familiar with the therapeutic benefits of assistance animals for people with disabilities such as that experienced by Mr. Bhogaita. Upon request, I would be happy to answer other questions you may have concerning my recommendation that Mr. Bhogaita have an emotional support animal. Should you have additional questions, please do not hesitate to contact me.

(*See* Doc. 1 at 3). On August 17, 2010, Bhogaita sent another letter to AHCA. In it, Bhogaita claimed an additional disability related to his knees. (Doc. 35-4 at 109; *see also* Doc. 35-5 at 17).

After receiving these letters, and notice of Bhogaita's newly claimed knee problem, AHCA sent a second request to Bhogaita on August 17, 2010, which stated, in relevant part,

    1. Please list **each individual disability** that you feel your pet is required for in order for you to offset the effects of those individual disabilities. Originally you claimed one disability, now you are claiming another disability. Please list all related disabilities.

    2. Please provide documentation from a medical professional(s) that clearly supports that you have any of the disabilities noted above, disabilities that substantially limit a major life activity, <u>and that you are in need of a trained "support animal" that exceeds the 25 pound weight limit for that disability</u>. Please include contact physician information as well. (Note: You have already provided documentation regarding your claim related to mental health issues; however, your psychiatrist has not indicated that you need an oversized pet for this disability. This should be clarified by him if you want to exception for this particular condition considered.)

3. If you add names of any additional medical professional(s) from your original submission only of Dr. Li, please include how many sessions you have had with those additional physicians similar to the information you provided regarding your sessions with Dr. Li.

4. Please provide all information related to the professional training your pet has successfully completed regarding the assistance you claim he/she is required to offer you as a support animal. This requested information shall include the type of training the pet received specific to the disability, the dates of training, the location of training, names and contact name of the trainer(s), and copies of any certificates of successful completion.

(Doc. 35-5 at 20-21). Plaintiff did not respond to this request. Nearly two and a half months passed, until on November 3, 2010, AHCA sent a third letter to Bhogaita requesting a sworn statement from Dr. Li, including "specific facts" regarding,

1. the exact nature of [Bhogaita's] alleged mental disability;

2. [Bhogaita's] treatment, including a list of all medications and the number of counseling sessions per week;

3. details of how the diagnosis was made;

4. the total number of hours and sessions of mental health treatment [Bhogaita] has received;

5. how long [Bhogaita] has been a patient of the psychiatrist and how long he's been treated for mental disability;

6. whether the condition is permanent or temporary;

7. details of the prescribed treatment moving forward;

8. description of how the mental disability substantially limits [Bhogaita's] major life activities;

9. details of why a smaller dog would not sufficiently provide [Bhogaita] an equal opportunity to enjoy his unit; and

10. documentation of the individualized training [Bhogaita's] dog received for the purpose of helping him with his mental disability, including dates, contact information of the instructor, and copies of any certifications received.

(Doc. 1 at 4-5). The letter went on to state that, if Bhogaita did not respond by December 6, 2010, "then this letter shall serve as the Association's formal demand for you to remove any dogs over 25 lbs from your unit no later than December 10, 2010." (Doc. 36-10 at 3). Moreover, if he failed to remove his dog by that date, "then [AHCA] will be forced to file for Arbitration . . . PLEASE GOVERN YOURSELF ACCORDINGLY." (Doc. 36-10 at 3).

Bhogaita filed a complaint with the United States Department of Housing and Urban Development ("HUD") and the Florida Commission on Human Relations on December 1, 2010. Both agencies issued a finding of cause on January 21, 2011 and Bhogaita filed the instant lawsuit on October 11, 2011. The Complaint asserts two causes of action, only one remains: failure to reasonably accommodate pursuant to 42 U.S.C. § 3604(f)(3)(B) and Fla. Stat. § 760.23(9)(b). Both parties now move for summary judgment.

**II.    Standard**

A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Servs., Inc.*, 252 F. Supp. 2d 1347, 1351-52 (M.D. Fla. 2003). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255.

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324-25 (internal quotations and citations omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324-25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value") (citations omitted); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

Faced with cross motions for summary judgment, a court must consider each motion on its own merits. *See Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983). Where both parties "disagree as to the facts and take inconsistent legal theories[,] the mere filing of cross motions for summary judgment does not warrant the entry of such judgment." *Id.*

### III.     Discussion

To prevail on a section 42 U.S.C. § 3604(f)(3)(B) and FLA. STAT. 760.23(9)(b) claim,[3] plaintiff must establish that, (1) he is handicapped within the meaning of the FHA, (2) he requested reasonable accommodation, (3) such accommodation was necessary to afford him an opportunity to use and enjoy the dwelling, (4) Defendants refused to make the requested

---

[3] "The Florida Fair Housing Act contains statutory provisions that are substantively identical to the federal Fair Housing Act." *Loren v. Sasser*, 309 F.3d 1296, 1299 n. 9 (11th Cir.2002). Accordingly, the same analysis applies to both of Bhogaita's claims. *Hawn v. Shoreline Towers Phase I Condominium Ass'n, Inc.*, 347 Fed. App'x 464, 467 (11th Cir. 2009).

accommodation. *Hawn v. Shoreline Towers Phase I Condominium Ass'n, Inc.*, 347 Fed. App'x 464, 467 (11th Cir. 2009). The Parties dispute only two issues, whether Plaintiff is handicapped within the meaning of the FHA and whether Defendant denied his requested accommodation. Each issue will be addressed in turn.

**A. Is Plaintiff Handicapped within the Meaning of the FHA?**

*1. The ADA Amendments Act of 2008*

An individual is handicapped, for the purposes of the Fair Housing Act, if he or she has (a) "a physical or mental impairment which substantially limits one or more of such person's major life activities," (b) "a record of such impairment," or (c) is "regarded as having such an impairment." 42 U.S.C. § 3602(h); *Hawn,* 347 F. App'x at 467. The Eleventh Circuit looks to case law under the Rehabilitation Act and the Americans with Disabilities Act ("ADA") for guidance in determining whether an individual is handicapped under the FHA. *United States v. Hialeah Hous. Auth.*, 418 F. App'x 872, 876 (11th Cir. 2011). On January 1, 2009, however, the ADA was amended by the ADA Amendments Act of 2008 ("ADAAA"). 42 U.S.C.A. §12102(4)(E)(i) (2009) (the "ADAAA"); *see also Palmer v. Albertson's LLC*, No. 4:09-CV-00137-SPM-WCS, 2010 WL 785652, at n.2 (N.D. Fla. March 3, 2010). The ADAAA explicitly lowered the standard for "substantially limits" noting that "lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities" and that "the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, . . . the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." Pub. L. No. 110-325, § 2(a)(6), 122 Stat. at 3553.[4]

---

[4] *See also* Statement of Managers to Accompany ADA Amendments Act, 154 Cong. Rec.

While the ADAAA substantively amended the ADA and superseded prior case law, the FHA has not been similarly amended. The question, then, is whether the new standard announced in the ADAAA—and subsequent case law—applies to the definition of 'handicapped' under the FHA. Plaintiff argues that the ADA, FHA and Rehabilitation Act are interpreted *in pari materia*. Further, "[i]n amending the ADA, Congress sought to clarify its [definition] of 'handicapped individual' so [that] the interpretation would be consistent with the definition as intended prior to the ADA, under the RA." Thus, in amending the ADA, Congress impliedly amended the definition in the FHA. Defendant is correct, however, that no court has directly addressed the issue—the cases cited by Plaintiff are inapposite.[5] In fact, Plaintiff cites no legal authority for its proposition that the amendment of one statute bears on the interpretation of another statute not similarly amended. Divergent interpretations of the three statutes may indeed result in a person being considered disabled under the ADA, but not handicapped under the FHA. As the Eleventh Circuit has noted however, "there are important differences among these statutes . . . , the ADA and the RA may be broader than the FHA . . ." *Schwarz v. City of Treasure Island*, 544 F.3d 1201,

---

S8840, S8841 (daily ed., Sept. 16, 2008) ("It is our expectation that because the bill makes the definition of disability more generous, some people who were not covered before will now be covered . . . . This bill lowers the standard for determining whether an impairment constitute[s] a disability and reaffirms the intent of Congress that the definition of disability in the ADA is to be interpreted broadly and inclusively."); 29 C.F.R. §1630.2(j)(1)(vi) (2012) ("The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term 'substantially limits' shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA."); *Gil v. Vortex, LLC*, 697 F. Supp. 2d 234, 238 (D. Mass. 2010).

[5] *See, e.g., Forbes v. St. Thomas Univ., Inc.*, 768 F. Supp. 2d 1222, 1224-27 (S.D. Fla. 2010) (relevant facts occurred prior to enactment of the ADAAA); *Peters v. Univ. of Cincinnati College of Medicine*, No. 1:10-CV-906, 2012 WL 3878601 at \*1-\*3 (S.D. Ohio, Sept. 6, 2012) (same). *See also,e.g., McKivitz v. Twp. of Stowe*, 769 F. Supp. 2d 803, 821 n .15 (W.D. Pa. 2010) ("There is no need for the Court to consider whether, in the aftermath of the ADA Amendments Act, some individuals who are "disabled" within the meaning of the ADA and the Rehabilitation Act may not be "handicapped" within the meaning of the FHA.").

1212 (11th Cir. 2008) (discussing the various differences in the statutes and noting "[u]ndoubtedly there are other differences, but we leave them for another day."). Absent persuasive evidence to the contrary, the Court must presume that Congress "means in a statute what it says there." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 462, 122 S. Ct. 941, 956, 151 L. Ed. 2d 908 (2002).

   *2. Is Plaintiff handicapped for the purposes of the Fair Housing Act?*

The parties focus solely on the first prong of the analysis, whether "a physical or mental impairment which substantially limits one or more of such person's major life activities." To determine whether a person has such an impairment, courts follow a three part analysis. First, Plaintiff must show that he suffers from a physical or mental impairment. Second, the Court must evaluate the facts concerning the life activities affected by the impairment to determine if they constitute 'major' life activities. "If so, the Court thirdly fuses the first two parts and asks whether the plaintiff's impairment substantially limits a major life activity." *Forbes v. St. Thomas Univ., Inc.*, 768 F. Supp. 2d 1222, 1229 (S.D. Fla. 2010). Under applicable FHA regulations, " '[m]ajor life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 24 C.F.R. § 100.201(b). For purposes of the instant motion, Defendant does not appear to dispute that Plaintiff suffers from an impairment: Post-Traumatic Stress Disorder ("PTSD") brought on by military sexual trauma.[6] Nor does Defendant dispute that working and "interacting with others" are major life activities. The only issue raised is whether Plaintiff is 'substantially limited' in these activities.

The Supreme Court has said "[w]hen the major life activity under consideration is that of

---

[6] "(a) Physical or mental impairment includes: . . . (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities . . . ." 24 C.F.R. § 100.201

working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (superseded by the ADAAA). Regulations under the ADA instruct that an individual's ability to work is "substantially limited" when the individual is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i); *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1227 (11th Cir. 2005).

There is evidence in this case that Bhogaita would be unable to work without Kane— Bhogaita testified to that effect in deposition and Dr. Li's letters indicated the same. Even viewed in a light most favorable to AHCA, a reasonable jury could find that Bhogaita is unable to work in any job that requires significant interaction with other people. On the other hand, Defendant points out that Bhogaita held several jobs in the years leading up to this suit. With only sporadic periods of unemployment, Plaintiff worked in various call centers as a technical support person for several different companies from 2000 until August 2010, when he obtained his current job working from home. Presumably, Plaintiff was required to interact with co-workers and customers at each of these jobs, yet, he managed to stay employed for the better part of ten years. This disputed issue of material fact precludes summary judgment for either party.[7]

### B. Did AHCA Constructively Deny the Requested Accommodation?

To establish a cause of action under the FHA, a defendant must refuse to make a requested accommodation. *Schwarz ,*544 F.3d at 1219. The denial of an accommodation "can be

---

[7] Having found a disputed issue with respect to 'working,' it is unnecessary to address Bhogaita's limitation with respect to interacting with others or sleeping.

both actual or constructive, as an indeterminate delay has the same effect as an outright denial." *Hialeah Housing Authority*, 418 Fed. App'x at 878 (citing *Groome Resources Ltd. v. Parish of Jefferson*, 234 F.3d 192, 199 (5th Cir.2000)). This does not mean, however, that a defendant must accommodate all requests without question; rather, "[d]efendants must instead have . . . the ability to conduct a meaningful review of the requested accommodation to determine if such an accommodation is required by law." *Schwarz*, 544 F.3d at 1219 (quoting *Prindable v. Ass'n of Apartment Owners*, 304 F. Supp. 2d 1245, 1258 (D. Haw. 2003)). For example, "a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability . . . , (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation. This inquiry need not be highly intrusive. In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary . . . ." *Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617, 621-22 (6th Cir. 2011) (citation omitted). *See also*, *Hawn v. Shoreline Towers Phase I Condominium Ass'n, Inc.*, No. 3:07-cv-97/RV/EMT, 2009 WL 691378 at * 7 (N.D. Fla. 2009), *aff'd,* 347 Fed. App'x 464 (11th Cir. 2009) ("[I]t is reasonable to require the opinion of a physician who is knowledgeable about the subject disability and the manner in which a service dog can ameliorate the effects of the disability." (quoting *Prindable v. Ass'n of Apartment Owners*, 304 F. Supp. 2d 1245 (D. Haw. 2003))).

In this case, AHCA had three letters from Dr. Li which explained that, (1) Bhogaita has a mental illness related to military trauma which resulted in stress and anxiety; (2) he is limited in his ability to work with other people and has difficulty with social interactions of any kind because of stress and anxiety; and (3) that he has a "therapeutic relationship with [his] dog, Kane"—an

"emotional support animal"—and that "Kane serves to ameliorate otherwise difficult to manage day to day psychiatric symptoms in [Bhogaita]." Specifically, Dr. Li explained that without Kane, "social interactions would be so overwhelming that [Bhogaita] would be unable to perform work of any kind."

Even viewed in a light most favorable to AHCA, this is sufficient information. Yet, it sent another letter requesting additional documentation explaining why he was in need of an animal over twenty-five pounds for his mental health disability, and information related to the "professional training" Kane successfully completed—including "the type of training the pet received specific to the disability, the dates of training, the location of training, names and contact name of the trainer(s), and copies of any certificates of successful completion." Even assuming that this request was reasonable, the third letter sent by Defendant on November 3, 2010 clearly went beyond the scope of a 'reasonable inquiry.' It requested, *inter alia*, additional information regarding Bhogaita's treatment, medications, and the number of counseling sessions he attended per week; details about how the diagnosis was made; whether the condition was permanent or temporary; and "details of the prescribed treatment moving forward."

AHCA points out it never attempted to evict Plaintiff, never required him to remove his dog, or otherwise punish him for the dog's presence. It cites several cases where a court held that an indeterminate delay is not a constructive denial if a plaintiff is not actually deprived of his requested accommodation. *Overlook Mut. Homes, Inc. v. Spencer*, 415 F. App'x 617, 621-22 (6th Cir. 2011); *DuBois v. Ass'n of Apartment Owners of 2987 Kalakaua*, 453 F.3d 1175, 1179 (9th Cir. 2006). Both *Overlook* and *DuBois* involved service animals which were explicitly permitted to remain with their owners during the investigation into their requests for accommodation under the FHA. Under those facts, both courts held that there was no denial. This case is distinguishable,

however, for at least two reasons, (1) AHCA never granted a 'temporary exemption," or a waiver of any kind, and (2) it specifically demanded that Plaintiff remove his dog within thirty days of the final letter if he did not provide AHCA with information it was not entitled to receive. As this Court noted in a previous Order, "[b]y persisting in its intrusive quest for more—and largely irrelevant—information, AHCA constructively denied Bhogaita's request." (Doc. 17 at 7). Accordingly, the Court will grant summary judgment in favor of Plaintiff with respect to this issue.[8]

It is therefore,

**ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 36) is **GRANTED IN PART and DENIED IN PART** as stated above. Defendant's Motion for Summary Judgment (Doc. 34) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on December 17, 2012.

_____
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

---

[8] Because this Order does not end the case, it is unnecessary to address Plaintiff's arguments with respect to relief.